## D'Auria v. Liposky

*Maxwell Lizza, Thomas Waggoner* and *Lewis D'Auria,* for plaintiff.

*Anthony Cavalcante,* for defendants.

DUMBAULD, J., September 26, 1960.—Defendants contend that a verdict in plaintiff's favor for $2,000 should be set aside on the ground that the jury should have been instructed that defendants were entitled to plaintiff's earnings on the theory that they stood in loco parentis.

Actually, defendants are not plaintiff's natural or adoptive parents, but merely foster parents with whom the Fayette County Institution District Child Welfare Services had placed plaintiff in a foster home placement. The trial judge, in view of this circumstance, denied defendants' requests for instructions:

"1. Under all the evidence, the Defendants stood in Locos (sic) Parentis to the Plaintiff.

"2. Under all the evidence, the Defendants, standing in Locos (sic) Parentis, were entitled to demand and receive the wages and earnings of the Plaintiff."

Elaborating the facts in greater detail, plaintiff was born March 12, 1929, and in November 1937 was placed by the welfare agency in defendants' home. De-

fendants had previously requested to be listed for such placements, not having any particular children in mind, but desiring to be numbered among the foster parents utilized by the agency. Defendant-husband was then unemployed, but later, from 1942 to September 5, 1958, worked as a welder at Isabella. He turned over his pay checks to his wife. The family also from 1937 to 1956 operated an unprofitable grocery store belonging to a relative, and thus obtained groceries at wholesale prices.

At the time of placement, defendants knew how much the county would pay them for their services as foster parents, and were not obliged to take the children unless the terms were deemed satisfactory. The county did pay the agreed rate up to June 1, 1942, at which time plaintiff's father, being in military service, made an allotment which continued until July 31, 1945.*

In 1947, upon graduation from high school, plaintiff secured employment and continued to live with defendants until shortly before her marriage on May 23, 1953.

It is plaintiff's testimony that when she started work in July 1947, and got her first pay check, the wife-defendant told her "to hand over the check to her and she would save the money for me," so it would be a nest-egg when plaintiff left home or got married. Meanwhile, the work which plaintiff continued to do in the store and around the home "would take care of the room and board." Both defendants were present when this arrangement was made.

During her employment, plaintiff turned over to

---

* Perhaps the county resumed payments after the allotment ended until plaintiff reached 18, though defendants deny this. Apparently no official records of the county's payments were available, as none were put in evidence by either side. There was considerable confusion as to the amount of such payments.

Mrs. Liposky approximately $4,545.08 from plaintiff's earnings at Anchor-Hocking; $3,562.46 less union dues from earnings at Sportswear, and $672 unemployment compensation. Plaintiff received back from Mrs. Liposky an allowance of $8 a week. Sometimes she would also receive additional money for various purposes, such as purchasing gifts for the family, or to go on a vacation trip. The Liposkys' own daughter worked at the Uniontown Hospital and did not turn over her earnings to her mother.

But when the time came for her marriage, defendants, upon demand, failed and refused to turn over her accumulated savings to her.

Defendants testified that no such agreement as plaintiff described had ever been made. They said she had voluntarily turned over her checks to her fostermother, who had acted as "treasurer" for the family, and put all receipts into a "common pot" from which disbursements were made in accordance with the needs of the family, including Mrs. Liposky's parents, and that plaintiff's earnings have all been spent and dissipated.

The court squarely presented to the jury this conflict as to the facts regarding the relationship between the parties. Apparently the jury chose to accept plaintiff's version as more accurate than defendants', and to make, in accordance with the charge, allowance for benefits received by plaintiff out of her money during the time she continued to live with defendants while her employment continued. The verdict was for $2,-000. Plaintiff's earnings as proved less the $8 a week allowance would have justified a verdict of approximately $7,000. It cannot be said that the jury has not dealt fairly with the foster parents in this case.

Nor has defendants' counsel submitted any authority other than his own ipse dixit in support of the legal proposition upon the strength of which he seeks a new

trial. At argument en banc he agreed with the trial judge's statement that the foster parent relationship is not one to be entered into for profit. Surely it is a relationship, not of private law, but of public law, under the supervision of the juvenile court and the welfare agency acting for the county institution district. Here, as in adoption and custody cases, the welfare of the child is the dominant consideration. The agency or the court could substitute a new foster home at any time if conditions required it. (Here, of course, defendants admirably discharged the trust reposed in them of affording to plaintiff and her sister a proper upbringing under moral and religious surroundings, and for this they deserve praise.) But on such a public law relationship no private rights vested in defendants entitling them ipso facto to plaintiff's earnings.

As the trial judge stated in his charge, the law left the parties upon plaintiff's emancipation and employment free to make such agreement as they chose with regard to her future residence, board and lodging, and accumulation of savings to establish herself in life. The jury found plaintiff's version more persuasive. There is no reason for the court now to upset the determination duly made by the constitutionally appointed trier of the facts. There is no presumption here in favor of a gift by plaintiff to defendants. The trial judge did not rule erroneously in denying defendants' requested instructions.

### Order

And now, September 26, 1960, upon consideration of the foregoing case, defendants' motions for new trial and for judgment n. o. v. are overruled and refused, and the prothonotary is directed to enter judgment for plaintiff upon the verdict upon payment of the jury fee.